**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AL FALAH CENTER, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>TOWNSHIP OF BRIDGEWATER, et al.,<br><br>Defendants. | Civil Action<br><br>No. 3:11-cv-02397 JAP LHG<br><br>ELECTRONICALLY FILED |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

ARCHER & GREINER
A Professional Corporation
Christopher R. Gibson
One Centennial Square, East Euclid Avenue
Haddonfield, NJ 08033-0968
(856) 795-2121

*Attorneys for Plaintiffs*

ARNOLD & PORTER LLP
Peter L. Zimroth (admitted *pro hac vice)*
Bruce R. Kelly (admitted *pro hac vice)*
Kerry A. Dziubek (admitted *pro hac vice)*
399 Park Avenue
New York, NY 10022
(212) 715-1000
Fax no. (212) 715-1399

*Attorneys for Plaintiffs*

THE BRENNAN CENTER
Faiza Patel
Emily Berman
Elizabeth Goitein
(applications *pro hac vice* to be submitted)
161 6th Avenue
New York, NY 10013
(646) 292-8310

*Of Counsel*

ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
Aparna Garg
Bethany Li
Kenneth Kimerling
Sameer Ahmed
(applications *pro hac vice* to be submitted)
99 Hudson Street, 12th Fl.
New York, NY 10013
(212) 966-5932

*Of Counsel*

May 18, 2011

## PRELIMINARY STATEMENT

In January 2011 Plaintiff Al Falah Center ("Al Falah") submitted an application to the Township of Bridgewater's Planning Board for permission to renovate the Redwood Inn — a shuttered banquet hall located in a residential zone — for use as a mosque. Under a Bridgewater zoning ordinance that had been in effect for more than thirty years, a house of worship was a "conditionally permitted use" in a residential zone, meaning that it was permitted so long as the building complied with certain setback, lot coverage and similar requirements. Al Falah's proposal complied. The banquet hall's existing 230-car parking lot was more than sufficient. So this application should have been granted routinely.

It was not. After appeals to anti-Muslim prejudice appeared on the internet, the Planning Board's meeting to consider the application drew an extraordinary crowd that exceeded the capacity of the meeting room so that the hearing had to be rescheduled. One person in the crowd was heard to say to the Board, "I hope you get the message from this crowd." Unfortunately, it did.

Having seen the vehemence and nature of the opposition, Township officials decided to block the use of the Redwood Inn as a mosque. Within a few weeks, they hastily produced a "reexamination" of the Township's Master Plan asserting that the presence of houses of worship in residential zone had generated traffic problems. This was a patently pretextual finding. The Planning Board's own traffic consultant had written a report agreeing with a traffic analysis finding that Al Falah's proposed use of the property would not cause traffic problems. And just a few months earlier, the Township had conducted a comprehensive reexamination of its traffic

patterns that found no problem requiring any change to zoning rules applicable to houses of worship.

Nonetheless, without citing any facts or expert opinion about traffic, the "reexamination" report recommended a change in the zoning ordinance. The Township relied on this "reexamination" report to enact an ordinance designed to prohibit using this particular property as a mosque. The new ordinance prohibited houses of worship in residential zones but would not affect the operations of any of the seventeen existing houses of worship (none Islamic) in the Township. After the ordinance was enacted, the Planning Board disclaimed jurisdiction over the Al Falah application and dismissed it.

Plaintiffs seek a preliminary injunction declaring this new ordinance void and requiring Al Falah's application to be decided by the Planning Board under the zoning law in effect at the time the application was submitted. The new ordinance discriminates against plaintiffs because of their religion and imposes undue burdens on the free exercise of their religion. The federal Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First Amendment, as well as analogous state statutory and constitutional provisions, forbid this kind of discrimination and burden. In addition, the new ordinance violates New Jersey law governing municipal land use regulation. The Township wanted to act quickly to enact a new ordinance before May 5, 2011 — the effective date of a new statute that would have rendered any later-adopted new zoning ordinance inapplicable to Al Falah's application. In its unseemly haste, the Township ignored state law requiring that changes in zoning ordinances must be supported by real evidence and not mere expressions of "concern." This violation of state law provides additional evidence

that the ordinance was discriminatory. It also provides an independent ground for relief that the Court is empowered to grant as part of its supplemental jurisdiction.

Plaintiffs seek preliminary injunctive relief on an expedited basis. If there is no ruling on whether the Township's action was lawful before October 5, 2011 — the date before which Al Falah must close on the contract of sale — it will be forced to decide whether to purchase the property before knowing whether it can be used as intended. If, because of the uncertainty, it decides not to purchase the property, it will have given up precisely what this lawsuit is about — the ability to use that property as a mosque. If, on the other hand, it decides to go ahead with the purchase in spite of the uncertainty, it will have to incur additional expenses and other damages that will add to its costs if Plaintiffs ultimately lose the case and add to the damages payable by the Township if Plaintiffs ultimately prevail. Plaintiffs seek an expedited ruling to minimize these possible negative consequences.

## STATEMENT OF FACTS

### Acquisition of the Redwood Inn Property For Religious Use

Plaintiff Al Falah Center was formed by adherents of the Islamic faith residing in the Bridgewater area. Its members — nine of whom have joined in this action as Plaintiffs — have been gathering together to worship at rented locations for several years. They have been seeking a suitable location to establish a permanent mosque and Islamic community center. Chughtai Decl. ¶¶ 5-7.

Al Falah finally found a suitable location: the Redwood Inn, a banquet hall located on 7.64 acres in Bridgewater (the "Property"). The Redwood Inn for many years had rented its facilities for weddings, conferences, political fund-raising dinners and other types of gatherings,

both secular and religious. It ceased operation in approximately 2008. Al Falah's members knew it well because they had rented it for their major annual holiday services for several years. Chughtai Decl. ¶ 8. Although the building would require repairs, refurbishing and upgrading of some building systems, it was essentially ready to use for Al Falah's purposes. It had ample on-site parking: a paved lot with a capacity of 230 cars.

In October 2010, the Chughtai Foundation (the "Foundation"), a charitable organization established by an Al Falah member, signed a contract to purchase the Property. The Foundation intended to assign its right to purchase the Property to Al Falah and has done so. The contract requires a closing on or before October 5, 2011. Chughtai Decl. ¶ 23.

**The Application to the Planning Board**

The Al Falah Preliminary Site Plan Application (the "Application") was submitted on January 6, 2011. Tubman Decl. ¶ 7. Under Bridgewater zoning ordinances that had been in effect for decades, a house of worship was a conditionally permitted use in all residential zones, including the zone in which the Property is located. Tubman Decl. ¶ 5 & Ex. C. The Planning Board must consider the Application as a permitted use so long as it met requirements stated in Ordinance Section 126-353 pertaining to such matters as setbacks, building coverage and floor area ratio. The Ordinance imposed no requirement of access to particular streets or categories of roads.

The Application submitted to the Planning Board included, *inter alia*, (1) site plans, (2) an environmental impact statement, (3) landscaping plans, (4) architectural plans, (5) a stormwater report, and (6) a traffic impact analysis prepared by a traffic engineering firm. The traffic analysis showed that the proposed mosque use would generate only modest additional

traffic requiring no additional roadway improvements. The Application stated that Al Falah would use the Property for daily and weekly prayers, holiday services, a day care center, an elementary school (which later was withdrawn from the plans), weekend religious education class and community services and activities. Tubman Decl. ¶ 7 & Ex. D. The Foundation and Al Falah incurred approximately $200,000 in professional fees and other costs in order to ensure that the Application and supporting materials would demonstrate compliance with all applicable regulations. Chughtai Decl. ¶ 13.

Both before and after this submission, Al Falah's representatives discussed the Application with Township officials. In none of these discussions did Township officials suggest that the Application failed to comply with existing requirements. On the issue of traffic, the Township retained its own independent consultant, Gordon Meth, to review the traffic analysis submitted as part of the Application. Mr. Meth agreed that the proposed use of the Property would not create a traffic problem. Tubman Decl. ¶ 22 & Ex. H. This was confirmed by later correspondence from the County Planning Board, described at pages 11-12, below.

**The Aborted Hearing on the Application and the Decision to Change the Zoning Rules to Prevent Use of the Property For a Mosque**

The Application was scheduled for a public hearing on January 24, 2011 at the Municipal Courtroom in Bridgewater. After completing the hearing process, the Planning Board would consider the Application and then approve it so long as it met then-existing zoning law requirements. Approval should have been routine. Tubman Decl. ¶ 23-24. However, word about the Application spread quickly over the Internet. For example, one organization posted an announcement about the January 24 hearing on its Facebook page and encouraged "as many of our members as possible to attend." Walsh Decl. Ex. B. In an article about the proposed mosque

that was published a few weeks later, the president of the same organization was quoted: "Certainly a Muslim mosque raises questions about where the money is coming from and the principals involved and any association with terrorism. I have not brought that forward to raise opposition awareness to this mosque, but I am certainly not going to apologize for asking that question." Walsh Decl. Ex. K. The same organization conducted a fundraising campaign to oppose the Application. Walsh Decl. Ex. O.

More than 400 people appeared at this hearing to oppose the Application. Tubman Decl. ¶ 25. This was an extraordinary number, far exceeding the usual attendance at such hearings. *Id.* The Planning Board's attorney announced that the hearing had to be adjourned because the attendance exceeded fire code occupancy limits. Tubman Decl. Ex. I at 8. The hearing on the Application was rescheduled for February 28, 2011 at a larger hall. Some of those in attendance at the January 24 hearing pointedly told the Planning Board that the extraordinary turnout showed the strength of public opposition to a mosque in Bridgewater. When the Planning Board's attorney announced that the attendance exceeded occupancy limits, a woman in the crowd called out, "That should tell you something, then." *Id.* Another person told the Board, "I hope you got the message from this crowd." Chughtai Decl. ¶ 17.

When the adjournment was announced, many of those in attendance then got up to leave the hearing room. Tubman Decl. ¶¶ 28-29 & Ex. J. Shortly thereafter, however, when all or most of the public had left the hearing room, the Planning Board continued its discussion of the matter. At or about this time, the Mayor and the Planning Board decided to seek the enactment by the Township Council of an ordinance amending the Township's zoning law that would prevent the use of the Property for a mosque. This change would have to be enacted with

unusual speed. On May 5, 2010 New Jersey had enacted a new statute, to take effect on May 5, 2011, providing that the development regulations in effect on the date of submission of a site plan application would govern any decision made on that application. N.J.S.A. § 40:55D-10.5. The Township therefore would have to enact its amendment before May 5 for it to have its intended effect — prohibition of the mosque on the Property. This timing would be difficult not only because of the procedures that such a change requires but also because of several substantive requirements of New Jersey land use law, discussed in detail at pages 22-25, below. Because these state law requirements could not be met, and certainly not before May 5, Defendants chose to violate them.

**The Township Initiates Its Plan To Accomplish the Unlawful Zoning Change**

At the aborted January 24, 2011 hearing, following the adjournment of consideration of the Application due to the overflow crowd, the Planning Board, at the Mayor's suggestion, directed the Township Planner, Scarlett Doyle, to prepare a "reexamination report" focusing on houses of worship in order to create a justification for an ordinance amendment that would preclude use of the Property for a mosque. Under N.J.S.A. § 40:55D-89, the purpose of such a reexamination report is to identify and discuss

> major problems and objectives relating to land development in the municipality at the time of the adoption of the last reexamination report … [t]he extent to which such problems and objectives have been reduced or have increased subsequent to such date,… [t]he extent to which there have been significant changes in the assumptions, policies, and objectives forming the basis for the master plan or development regulations as last revised …[and][t]he specific changes recommended for the master plan or development regulations, if any, including underlying objectives, policies and standards, or whether a new plan or regulations should be prepared.

Bridgewater had undertaken several reexamination reports since the adoption of its 1990 Master Plan. Two are pertinent here. In 2005 the Planning Board adopted a reexamination report that addressed houses of worship. Tubman Decl. Ex. N. The report made recommendations regarding issues such as maximum lot coverage and parking. It did not mention traffic concerns related to houses of worship in residential zones. In September 2010 — just four months before the Foundation submitted its Application — the Township prepared a reexamination report specifically addressing traffic issues. Tubman Decl. Ex. O. It analyzed traffic and accident patterns, proposed policies and recommended ordinance revisions. But the 2010 Report did not identify any problems arising from traffic related to houses of worship — although any such problems would have been within the scope of its inquiry. The 2010 Reexamination Report recommended some changes in zoning, but none would have affected the siting of houses of worship. It mentioned houses of worship only in its discussion of parking, which proposed no change in requirements but suggested that houses of worship be "encouraged" to adopt shared parking arrangements. Tubman Decl. Ex. O at 21, 23. The 2010 Report confirms that its failure to mention traffic problems related to houses of worship means that there were none:

> This report focuses on selected traffic and circulation issues that have emerged during the post Reexamination report years [i.e., since the February 2005 Amendment and Report]. *Policies, problems and objectives not noted in this report or the Circulation Element of the Master Plan are considered to be unchanged in content from the prior Reexamination reports.*

Tubman Decl. Ex. O Appendix at 6 (emphasis added).

**The February 8, 2011 Reexamination Report Ordered By the Planning Board**

Ms. Doyle completed the requested reexamination report in time for it to be considered at a February 8, 2011 Planning Board meeting. Although the prior reexamination reports in 2005 and in September 2010 had found no traffic issues related to houses of worship, the February 8, 2011 Reexamination Report raised such concerns for the first time. It failed actually to state what the concerns were, on what the concerns were based, or when they supposedly arose. The 2011 Reexamination Report nonetheless asserted that Bridgewater should limit significantly the siting of houses of worship in residential zones. It said:

> While Bridgewater remains committed to continue to permit schools, country clubs and open air clubs in certain residential zones and houses of worship as a permitted or conditional uses [sic] in all zones, it is necessary to introduce ordinance requirements to assure that the participants will have convenient travel to their point of assemblage without unduly affecting the abutting and nearby residential neighborhoods.

Tubman Decl. Ex. P at 7. The 2011 Reexamination Report went on to recommend that where schools, country clubs, open air clubs, or houses of worship are to be located in residential zones, these uses should be required to have principal access from a state highway, a county roadway, or one of four specific municipal road segments (the "Four Road Segments," consisting of portions of Garretson Road, Country Club Road, Milltown Road and Prince Rodgers Avenue). Tubman Decl. Ex. P at 7-8.

The 2011 Report cited no traffic study, report, or expert testimony identifying existing or foreseeable problems arising from house-of-worship traffic. The seventeen existing houses of worship within the Township (none of which is Islamic) would be permitted to continue their operations without change following the zoning amendment proposed by the Reexamination Report. Most of those houses of worship have access to a state highway, county roadway or one of the specially selected Four Road Segments. Tubman Decl. ¶ 39. Those existing houses of

worship therefore would remain permitted or conditionally permitted uses at their existing locations, where they not only could continue their operations but could expand in the future. The few remaining houses of worship would not be required to cease operations as a result of the rezoning; they would be permitted to continue as pre-existing nonconforming uses under N.J.S.A.§ 40:55D-68. Al Falah's proposed mosque was the only existing or proposed house of worship that would have been precluded from operation by the proposed change in zoning.

At the conclusion of the February 8, 2011 meeting, the Planning Board adopted the 2011 Reexamination Report. Tubman Decl. ¶ 42.

Both before and after the February 8 Planning Board meeting, members of the Bridgewater Muslim community experienced threats, harassment, and anti-Muslim hate speech that created a hostile and fearful environment. Members who had spoken at hearings in support of the mosque had their home addresses and other personal information posted publicly in the "comments" section of online news stories about the hearings; anti-Muslim remarks were posted in the same "comments" sections. Wallis Decl. ¶ 15 & Ex. B.

**The Township Council's February 17, 2011 Meeting**

Almost immediately after the 2011 Reexamination Report was adopted by the Planning Board, the Township Council began its process of enacting an ordinance implementing the 2011 Reexamination Report's recommendation. At a February 17, 2011 meeting, the Township Council introduced a proposed ordinance consistent with the 2011 Reexamination Report's recommendation, providing that houses of worship shall remain conditional permitted uses in residential zones only if they are located on sites having principal access on a state highway,

county roadway or one of the Four Road Segments. Tubman Decl. ¶ 44. A public hearing and final action on the proposed ordinance was scheduled for March 3, 2011.

**The February 28, 2011 Reconvened Planning Board Hearing on the Application**

On February 28, 2011, the Planning Board reconvened the public hearing on the Al Falah Application that had been adjourned on January 24 due to overcrowding.

Before the February 28 hearing, word again spread on the Internet and other media about the Application. Again, a press release encouraged readers to attend the Planning Board hearing, and the commentary on web pages concerning the meeting included inflammatory anti-Muslim statements. Approximately 650 people attended the February 28, 2011 hearing — again an extraordinary attendance. Tubman Decl. ¶ 51.

At the February 28 public hearing, the Planning Board heard testimony from Imam Agha Tayyab on behalf of the applicant to describe the use to which the Property would be put. Tubman Decl. ¶ 54 & Ex. U at 91-176. This witness was questioned by Planning Board members, the Board's Planner, Traffic Engineer and Attorney, by attorneys representing objectors, and by members of the public. There was insufficient time for Al Falah to complete its presentation of evidence demonstrating the Application's compliance with existing law. At 10:35 p.m. the Planning Board adjourned the hearing, announcing a continued hearing on March 28, 2011, which was after the Township Council's scheduled vote on the proposed ordinance. Tubman Decl. ¶ 55.

On March 1, the Planning Board sent to the Township Council a "referral report" on the proposed ordinance. This report acknowledged that the proposed ordinance was "inconsistent with the Master Plan to the extent that the Master Plan does not explicitly address the specific

details of the recommended ordinance." But, the report continued, the ordinance would be consistent with unspecified "general purposes, objectives and intent of the Master Plan." Tubman Decl. Ex. V.

On March 8, the Somerset County Planning Board sent a letter that further undermines any claim that the proposed mosque would cause traffic problems. As is routine, the applicant had submitted an application for county approval of its site plan. The County Planning Board reviewed the materials to determine what effects the project would have on county roads. The County Planning Board determined that the new mosque would generate a negligible 0.7% increase in evening peak hour traffic volumes at the intersection of Foothill Road and Mine Road, where the County already was planning to install a new traffic light. It accordingly directed, as a condition of county approval, that the applicant pay 0.7% of the cost of the new traffic light, or $2,075. Tubman Decl. ¶¶ 57-59 & Ex. X.

**The Township Council's Public Hearing to Approve the Proposed Ordinance**

On March 14, 2011, the Township Council held a public hearing on the Proposed Ordinance. Even though the hearing was about enactment of a purportedly Township-wide revision of the zoning law, the transcript shows that the meeting was really about whether to permit use of the Property for a mosque. Hirsch Decl. Ex. A. The majority of those who spoke in favor of the ordinance made specific comments about the proposed mosque on Mountain Top Road. *Id.*

The Township Council unanimously passed the proposed ordinance. It is Ordinance No. 11-03. Tubman Decl. ¶ 61.

**Purported Dismissal of the Application**

Based on the passage of Ordinance 11-03, the Planning Board disclaimed jurisdiction to approve the Application and voted to dismiss it on or about April 12. Tubman Decl. ¶ 66.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show that it is (1) reasonably likely to prevail on the merits, and (2) likely to suffer irreparable injury without relief. Once these threshold showings are made, the Court may consider the balance of hardships an injunction would impose and whether granting relief would serve the public interest. *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002). As demonstrated below, this case warrants preliminary injunctive relief.

## I. PLAINTIFFS WILL PREVAIL ON THE MERITS

### A. The Ordinance Violates the Religious Land Use and Institutionalized Persons Act

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, prohibits state and local government infringement on religious exercise through land-use regulation. The law is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g). The law's co-sponsors, Senators Kennedy and Hatch, described the problem it addressed as follows:

> The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.
>
> The hearing record compiled massive evidence that this right is frequently violated. Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly

> individualized and discretionary processes of land use regulation. Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes....
>
> Sometimes, zoning board members or neighborhood residents explicitly offer race or religion as the reason to exclude a proposed church, especially in cases of black churches and Jewish shuls and synagogues. More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or "not consistent with the city's land use plan."

146 Cong. Rec. S7774-01 (July 27, 2000) (Ex. 1, Joint Statement of Sen. Hatch and Sen. Kennedy).

This case is a textbook illustration of the type of overreach that RLUIPA is designed to end. Islam is not a "new, small or unfamiliar" religion worldwide. But in the United States it is a minority religion, unfamiliar to many people, and the object of unfair popular prejudice because some Americans conflate Islam with the acts of terrorists who purport to speak in its name. Plaintiffs sought a building in which to practice Islam. They contracted to buy an existing building in which that use was permissible under existing zoning law. The hearing on what should have been a routine application to the Planning Board revealed vocal and strident opposition, some of which is obviously the product of anti-Muslim animus. Seeing that opposition, Bridgewater's officials rewrote the Township's zoning law so that religious use of the Property no longer would be conditionally permitted. The purported concerns about traffic have no justification in the record and clearly are pretextual in light of the prior iterations of the Master Plan and the recent reexamination reports, the report of the Planning Board's own traffic consultant, and the conclusion of the County Planning Board — none of which raised such concerns. Although the Ordinance ostensibly is of general application, the proceedings surrounding its adoption and its absence of any practical effect on existing non-Muslim houses of

worship show that it was tailor-made to block this mosque. In short, this is the paradigmatic case Congress sought to reach when it enacted RLUIPA.

Bridgewater's Ordinance is subject to RLUIPA because it "limits or restricts a claimant's use or development of land (including a structure affixed to land)" in which the claimant (Al Falah) has a property interest. 42 U.S.C. § 2000cc-5(5). RLUIPA provides the following distinct grounds for invalidating the Ordinance.

**Discrimination** — RLUIPA bars land use regulation "that discriminates against any assembly or institution on the basis of religion or religious denomination." § 2000cc (b)(2). To establish a violation of section 2000cc(b)(2), Plaintiffs must show that (1) Al Falah is an "assembly or institution" (as it indisputably is), (2) subject to a "land use regulation" (also indisputable), (3) that has been imposed or implemented "in a manner that discriminates against [Al Falah] on the basis of religion or religious denomination." *Id.* The discriminatory character of an ordinance may be shown by inference; it is rare for a municipality to be so lacking in subtlety as to enact explicitly discriminatory legislation. *See Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005) (RLUIPA protects religious groups from "subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards"); *Adhi Parasakthi Charitable, Med., and Cultural Soc. of N. America v. Twp. of W. Pikeland*, 721 F. Supp. 2d 361, 377, 386 (E.D. Pa. 2010) (inference of discrimination could be drawn from disparities in conditional use permit application process where Hindu group was required to go through a lengthy and expensive application process and other groups were not); *Albanian Associated Fund v. Twp. of Wayne*,

2007 WL 2904194, at *10-11 (D.N.J.) (Sheridan, J.) (inference of discrimination against Muslim group could be drawn from town's more favorable actions on comparable applications toward other religious and non-religious landowners).[1]

Three facts concerning Bridgewater's Ordinance — its timing, its effect, and its spurious justification — provide compelling circumstantial evidence that it is discriminatory. As to timing, the supposed concern about traffic addressed by the Ordinance, enacted in March 2011, was disclaimed only a few months earlier by the September 2010 reexamination report on Township-wide traffic circulation. All that changed was that Al Falah sought to use the Redwood Inn for a mosque.[2] The Application itself raises no traffic concerns. See pp. 4-5, 11-12, above. Al Falah's proposed mosque likely would involve a less intense peak use than the Redwood Inn experienced when it operated as a banquet hall; Al Falah's plans called for reducing the size of the parking lot from 230 spaces to 170. Tubman Decl. Ex. D at 87. As to effect, the Ordinance would permit all the Township's existing (non-Islamic) houses of worship on residential streets, including two-lane residential streets like Mountain Top Road, to continue their operations, and most even could expand them subject to coverage and setback limitations. The ordinance is thus highly "suggestive of discriminatory intent." *See Tenafly Eruv Ass'n*, 309 F.3d at 168. As to its purported justification, *Riya Finnegan LLC v. Twp. Council of S. Brunswick*, 197 N.J. 184, 962 A.2d 484 (2008), discussed at pages 23-24 below, establishes that

---

[1] In this respect RLUIPA jurisprudence is no different from that under the Free Exercise Clause, where discriminatory intent also may be inferred from circumstantial evidence. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993); *Tenafly Eruv Ass'n*, 309 F.3d at 165-66.

[2] In a similar case the court found discriminatory intent where the property at issue "sat vacant" for "nearly a decade," but once the disfavored religious group purchased it "the City became a bundle of activity" looking for alternative development options. *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1225 (C.D. Cal. 2002).

a zoning amendment is arbitrary and capricious, and hence invalid under state law, where it would block a proposed use based on nothing more than generalized "concern" about traffic, unsupported by hard evidence demonstrating that a proposed use actually will create a traffic problem. *Riya Finnegan* involved a secular commercial use. In this case the zoning amendment has been directed at a religious use by a minority religious group, and therefore its arbitrary and capricious character compels an inference of discriminatory intent.

Further circumstantial evidence of discriminatory intent can be found in the extraordinary atmosphere of the relevant Planning Board and Township Council meetings. It is clear that at least some of those in attendance were motivated by anti-Muslim animus rather than any concern about traffic. Tubman Decl. ¶ 25; Chughtai Decl. ¶¶ 17, 19-20; Abdelkader Decl. ¶¶ 9-12, 15; Wallis Decl. ¶¶ 25, 27; Hirsch Decl. ¶ 10. *See also Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 143 (3d Cir. 2002) (noting that religious animus is arbitrary and irrational); *Sts. Constantine and Helen Greek Orthodox Church*, 396 F.3d at 900 (where decision maker cannot justify a land-use decision burdening religious exercise, "the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision"); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 358, 350-51 (2d Cir. 2006) (following *Sts. Constantine and Helen Greek Orthodox Church*).

**Substantial burden on religious exercise** — RLUIPA's "general rule" requires a strict-scrutiny analysis of land-use regulations that substantially burden religious exercise:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution (A) is in furtherance of a compelling government interest; and (B) is the least restrictive means of further that compelling government interest.

42 U.S.C. § 2000cc(a)(1).[3]

The Ordinance imposes the "substantial burden" that triggers RLUIPA's "general rule" requiring strict scrutiny. The facts demonstrating "substantial burden" are clear: a religious organization has contracted to purchase a specific property for a religious use; when it entered into this contract a house of worship was a permitted use of that property; the Township then enacted an Ordinance changing the rules. Courts have found "substantial burden" when a municipality tried to change the rules midstream to preclude religious use of land. *See Albanian Associated Fund*, 2007 WL 2904194, at *10 (holding that municipality's adoption of a plan for "open space" preservation calling for condemnation of Muslim group's property while group's application to build a mosque there was pending before the planning board could reasonably have been found to present substantial burden on Islamic group's free exercise rights); *Cottonwood Christian Ctr.*, 218 F. Supp. 2d 1203 (to the same effect); *see also World Outreach Conf. Ctr.* v. *City of Chicago*, 591 F.3d 531, 535-38 (7th Cir. 2009) (holding city's alleged prevention of a church from continuing a non-conforming use of newly purchased property and later rezoning of the property to preclude continued religious use would be substantial burden);

[3] This rule applies under three alternative specified conditions. § 2000cc(a)(2). Two are met here. First, the Ordinance clearly affects interstate commerce. Construction projects such as the one Al Falah intends to carry out affect interstate commerce. *See Reich v. Mashantucket Sand & Gravel,* 95 F.3d 174, 181 (2d Cir. 1996); *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 541 (S.D.N.Y. 2006); *Cottonwood Christian Ctr.,* 218 F. Supp. 2d at 1221. Congress anticipated that the effect of construction on interstate commerce would provide a basis for application of RLUIPA. 146 Cong. Rec. S7774-01, S7775 (July 27, 2000). Second, the Ordinance has been imposed as part of a system of land-use regulations under which a government makes "individualized assessments of the proposed uses for the property involved." § 2000cc(a)(2). Decisions denying special use permits are such "individualized assessments." *E.g., Living Water Church of God v. Charter Twp. of Meridian,* 384 F. Supp. 2d 1123, 1130-31 (W.D. Mich. 2005); *Cottonwood Christian Ctr.*, 218 F. Supp. 2d at 1222. Here, Bridgewater's purpose in enacting the Ordinance obviously was to force the outcome of an individualized assessment by precluding the Planning Board from granting to Al Falah a conditional use approval that, absent the Ordinance, it would have been required to grant.

*Irshad Learning Ctr. v. Cty. of DuPage*, 2011 WL 1225459 at *14-15 (N.D. Ill. Mar. 28, 2011) (Islamic group stated claim for substantial burden where facts alleged showed that it agreed to all reasonable conditions on proposed religious use and county nevertheless refused to approve).

Once substantial burden on religious exercise is shown, the government can defend its action only by proving that the substantial burden furthers a "compelling governmental interest" and "is the least restrictive means of achieving that interest." § 2000cc(a)(1); *Washington v. Klem,* 497 F.3d 272, 277 (3d Cir. 2007). By this language, RLUIPA invokes the "most demanding test known to constitutional law." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997); *see also Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). Not only must the government identify a valid compelling interest, it must also show that its need is compelling with respect to "the particular claimant whose religious exercise is being burdened." *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430-3 (2006) (analyzing a parallel section of the Religious Freedom Restoration Act).

Bridgewater cannot meet the compelling-interest standard. Several factors suggest strongly that the Township's proffered traffic concerns were pretextual. See p. 16-17, above. Even if taken at face value, vague and unsubstantiated concerns about traffic and neighborhood integrity are analogous to other "quality of life" concerns that courts have found insufficiently compelling to justify burdening religious practice. *See Keeler v. Mayor & City Council of Cumberland*, 940 F. Supp. 879, 886 (D. Md. 1996) (courts are "unanimous in opining" that the following interests are not compelling: "safeguarding the heritage of the City…; stabilizing and improving property values…; fostering civic beauty; strengthening the local economy; and

promoting the use and preservation of historic districts and/or sites for the education, welfare and pleasure of the residents of the City").

### B. The Ordinance Violates the New Jersey Law Against Discrimination

The New Jersey Law Against Discrimination (NJLAD) establishes that it is "unlawful discrimination for a municipality . . . to exercise the power to regulate land use . . . in a manner that discriminates on the basis of . . . creed." N.J.S.A. § 10:5-12.5. As a rule, "New Jersey courts have interpreted the proofs and burdens of persuasion for discrimination under the NJLAD in ... generally the same manner as under federal discrimination statutes." *McAllister v. Greyhound Lines, Inc.*, 1997 WL 642994, at *7 (D.N.J.) (Wolin, J.) (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1212 (3d Cir. 1995)); *see also, e.g., Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 570 A.2d 903 (1990). Plaintiffs' state law claims of discrimination are thus coextensive with their religious discrimination claims under RLUIPA's antidiscrimination provision and the New Jersey and federal constitutions. Just as those claims are likely to succeed, so is Plaintiffs' NJLAD claim.

### C. The Ordinance Violates Plaintiffs' Constitutional Rights

Plaintiffs assert claims for deprivation of federal constitutional rights under 42 U.S.C. § 1983 and for deprivation of state constitutional rights under its New Jersey analog, N.J.S.A. § 10:6-2. For a claim under either statute, the conduct complained of must have (1) been committed by a person acting under color of state law and (2) deprived the plaintiff of a constitutional right. *West v. Atkins*, 487 U.S. 42, 48-49 (1988); *Rivkin v. Dover Twp. Rent Leveling Bd.*, 143 N.J. 352, 363, 671 A.2d 567, 573 (1996). Here, each individual Defendant is either (1) a local government official sued in his or her official capacity, and therefore a state

actor, or (2) a unit of local government that can be sued directly under section 1983 pursuant to *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978).

Ordinance 11-03 violates Plaintiffs' right to free exercise of religion, guaranteed by both the First Amendment and New Jersey's substantially similar guarantee that "No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience." N.J. Const. art. 1, § 3. A claim under the Free Exercise Clause requires a showing that the challenged law discriminates against religiously motivated conduct (i.e., it is not "neutral") or proscribes particular conduct only or primarily when the conduct is religiously motivated (i.e., the law is not of general applicability). *Church of the Lukumi Babalu Aye,* 508 U.S. at 542. If either showing is made, then the law must be scrutinized strictly; it cannot be upheld unless it is narrowly tailored to advance a compelling government interest.

Even if the text of a law appears to be neutral, it is not if its object is to restrict religious practices. *Id.* To determine the object of a law, courts may consider circumstantial evidence, including the events leading to its enactment, its legislative history and its effects. *Id.* at 540. In this case, the timing and manner in which Defendants passed Ordinance 11-03 strongly suggest that it was adopted to accommodate anti-Muslim animus. See pp. 16-17, above. *See, e.g., Tenafly Eruv Ass'n,* 309 F.3d at 153 (holding probability of success on Free Exercise Clause claim was established by evidence of selective enforcement of facially-neutral ordinance against practices of Orthodox Jewish community where ordinance had not been applied to similar conduct by secular groups); *Cottonwood Christian Ctr.*, 218 F. Supp. 2d at 1225 (government's sudden flurry of activity once religious group submitted land use permit application to build church on long-vacant land is circumstantial evidence of discriminatory intent); *see also Vill. of*

*Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 267 (1977) (racially discriminatory intent may be inferred from departures from normal procedural sequence in enacting zoning ordinance); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 142-43 (3d Cir. 1977) (following and applying *Arlington Heights*).

As demonstrated at pages 19-20above in the context of the RLUIPA claims, Defendants cannot demonstrate that Ordinance 11-03 is narrowly tailored to serve a compelling government interest.

The Ordinance also violates Plaintiffs' constitutional guarantee of equal protection under the Fourteenth Amendment, for essentially the same reasons that make it unlawfully discriminatory in violation of RLUIPA. See pp. 15-20, above.

### D. The Ordinance Is Arbitrary and Capricious In Violation of New Jersey Municipal Land Use Law

Under the Municipal Land Use Law, N.J.S.A. §. 40:55D1 *et seq.* ("MLUL"), first enacted in 1975, a zoning ordinance will be invalidated where, in whole or in application to any particular property, it is "clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute." *Pheasant Bridge Corp. v. Twp. of Warren*, 169 N.J. 282, 289-90, 777 A.2d 334, 339 (2001) (quoting *Bow & Arrow Manor, Inc. v. Town of W. Orange*, 63 N.J. 335, 343, 307 A.2d 563, 567 (1973)); *see also Bailes v. Twp. of E. Brunswick*, 380 N.J. Super. 336, 348, 882 A.2d 395, 402 (App. Div. 2005) (zoning power cannot be exercised arbitrarily); *Riya Finnegan*, 197 N.J. at 191, 962 A.2d at 489 (same); *Home Builders League of S. Jersey, Inc. v. Twp. of Berlin*, 81 N.J. 127, 137-38, 405 A.2d 381, 387 (1979) (same).

Ordinance 11-03 is invalid because it was improperly enacted in response to unsupported, generalized statements about neighborhood impacts and traffic concerns and has created an unreasonable restriction on Al Falah's right to use the Property. This conclusion is compelled by *Riya Finnegan*. In that case plaintiff filed a site plan application to build a drugstore on its property. The Planning Board and the Zoning Board both determined that a drugstore was a permitted use in the "Neighborhood Commercial" zone where the property was located. *Riya Finnegan*, 197 N.J. at 188, 962 A.2d at 487. Protesting neighbors responded by asking the township council to rezone plaintiff's property, claiming that the development would result in "additional traffic, noise, odor, dust, and pollution." *Id.* At a public hearing where the neighbors again voiced their concerns about the development of plaintiff's property, the township council amended the zoning ordinance, blocking the development of the drug store. *Id.* The township council recognized that the rezoning ordinance "would be inconsistent with the Master Plan." *Id.*

The council in *Riya Finnegan* purported to justify an ordinance that was not consistent with the township's master plan by stating in a resolution that the ordinance would "'significantly protect the health, safety and welfare of the residents and motorists in the area'" and it would "'prevent an intensification of traffic congestion at the intersection' . . . [and that] 'increased traffic from the site if it is developed as a commercial facility that is permitted by the C-1 zone will significantly impact the flow of cars and trucks through the Brunswick Acres residential development and past the Brunswick Acres elementary school and park.'" *Id.* at 189, 962 A.2d at 487.[4] The Supreme Court found that "the failure to point to any support for the

[4] The MLUL provides that "all of the provisions of [a] zoning ordinance or any amendment or revision thereto shall either be substantially consistent with the land use plan element and the housing plan element of the master plan or designed to effectuate such plan elements." N.J.S.A. § 40:55D-62(a). A municipal governing body may adopt a zoning ordinance or amendment that

Footnote continued on next page

[traffic] concerns expressed by the neighboring residents" made the township's justification for the ordinance "inadequate." *Id.* at 193, 962 A.2d at 490. It rejected unsubstantiated "generic" concerns about traffic as justification for such a rezoning ordinance. *Id.* at 193-94, 962 A.2d at 490. The Supreme Court held that the rezoning ordinance was "arbitrary, capricious and unreasonable." *Id.* at 195, 962 A.2d at 491.

*Riya Finnegan* is precisely on point in this case. Both in *Riya Finnegan* and in this case, the owner of property in a zone that permitted the proposed use submitted a site plan application complying with the zoning regulations. *Id.* at 188, 962 A.2d at 487; Tubman Decl. Ex. F at 2. The township in each case bowed to public pressure and changed a zoning ordinance on the basis of generalized, unsubstantiated traffic "concerns."

Here the Township's stated neighborhood integrity and traffic concerns were unsupported by evidence, thus rendering the Ordinance arbitrary and capricious. The Township failed to consider the prior reexamination reports that had addressed houses of worship (in 2005) and traffic in the township (in September 2010). Neither suggested a traffic problem associated with houses of worship. Nor did information about the mosque generated during the site plan application process support the Ordinance. In that process neither the expert hired by the applicant, nor the one hired by the Planning Board, nor the County Planning Board found a traffic problem; indeed, they found to the contrary. The 2011 Reexamination Report, on which Ordinance 11-03 is based, simply states conclusions. It starts with an unsubstantiated statement

---

Footnote continued from previous page
is not substantially consistent with the Master Plan "only by affirmative vote of a majority of the full authorized membership of the governing body, with the reasons of the governing body for so acting set forth in a resolution and recorded in its minutes." N.J.S.A. § 40:55D-62(a)

that there has been a growth of houses of worship. Tubman Decl. Ex. P at 6-7. From that statement it jumps to the conclusion that "it is necessary to introduce ordinance requirements to assure that the participants will have convenient travel to their point of assemblage without unduly affecting the abutting and nearby residential neighborhoods." *Id.* Platitudes about the desirability of "convenient travel" are not enough to explain why a decades-old zoning policy of permitting houses of worship throughout residential zones suddenly must be reversed.

Even though the Planning Board did not identify any supportable justification for the recommended zoning change, the Township Council introduced the Proposed Ordinance just nine days after the date of the Reexamination Report. The Proposed Ordinance was then referred to the Planning Board for a "consistency" review that failed to address the sole "consistency" issue of legal relevance: whether the Proposed Ordinance was substantially consistent with the Master Plan. The Planning Board instead offered nothing more than an assertion that the Proposed Ordinance was consistent with unspecified "purposes, objectives, and intent" of the Master Plan — a finding that the Township Council then adopted wholesale. *See* pp. 11-12. These actions confirm that the Township acted arbitrarily and capriciously in enacting the Ordinance.

RLUIPA and the constitutional guarantees discussed above are intended to prevent infringement of religious exercise through government action even when that action is otherwise lawful. In this case, however, the enactment of Ordinance 11-03 also violated state land use law unrelated to religious exercise. This violation provides powerful additional evidence that the Ordinance is discriminatory, for it is largely the result of the Township's haste to accommodate

public pressure for exclusion of a mosque. It also provides independent grounds for invalidating the Ordinance wholly apart from issues of religious discrimination.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY INJUNCTIVE RELIEF IS DENIED

To qualify as irreparable, Plaintiffs' injury must be "of a peculiar nature" and not compensable by money damages. *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004). There are two grounds for finding irreparable injury here. Any "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). It is well-recognized that "[l]imitations on the free exercise of religion inflict irreparable injury." *Tenafly Eruv Ass'n,* 309 F.3d at 178 (citations omitted); *see also Jehovah's Witnesses Assembly Halls of N.J., Inc. v. City of Jersey City*, 597 F. Supp. 972, 981 (D.N.J. 1984) (deprivation of free exercise right constitutes irreparable injury). If the Township is permitted to enforce Ordinance 11-03, Plaintiffs will be deprived of their right to exercise their religion freely. They will not be able to worship at a site they chose in reliance on long-standing existing zoning law that permitted use of such a property for a house of worship.

Second, money damages are not considered sufficient compensation for denial of property rights. The courts realize that every piece of real property is unique, and therefore money cannot make an aggrieved owner whole. *Cottonwood Christian Ctr.*, 218 F. Supp. 2d at 1230. No monetary compensation could satisfy "an interest in real property, which by its very nature is considered unique." *In re Bella Vista Assocs.*, 2007 WL 4555891, at *10 (D.N.J. 2007) (quotations and citations omitted); *see also Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary

compensation is an inadequate substitute."). If Ordinance 11-03 is enforced, Plaintiffs will be prevented from putting their property to its intended use, which is the only use Plaintiffs have for the property.

## III. BOTH THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR GRANTING PRELIMINARY INJUNCTIVE RELIEF

If preliminary injunctive relief is not granted and a decision on the merits is deferred, the harm to Plaintiffs will, as noted above, include immediate irreparable harm to their free exercise rights that is not compensable in money. But they will also suffer harms that may be compensable in money. Once Al Falah completes the purchase of the property (which it must do by October 5, 2011), it will be forced to bear the carrying costs of ownership — interest, insurance, maintenance, and taxes. Any such expenses incurred while awaiting a decision on this motion will be a deadweight loss no matter who wins this case. If the Plaintiffs win, those expenses will be recoverable as damages, ultimately paid by Bridgewater's taxpayers. If Defendants win, Al Falah — a nonprofit religious group — will have to absorb those expenses. There is no realistic possibility of offsetting those expenses by renting the property as a banquet hall in the interim because the building would require extensive repairs. Tubman Decl. ¶ 67. Moreover, Congress by enacting RLUIPA identified a strong public interest in prohibiting local governments from frustrating religious land uses. That interest is best served by prompt relief.

If preliminary injunctive relief is granted but then later vacated following further proceedings, the potential harm to Bridgewater would be *de minimis*. The Ordinance on its face applies to dozens if not hundreds of properties within the Township's residential zones. This lawsuit is about just one. If a preliminary injunction is entered and later vacated in this case, the overall scheme established by the Ordinance for regulation of land use in residential zones will be largely unaffected.

## CONCLUSION

Plaintiffs' motion should be granted. The Court should enter a preliminary injunction (1) declaring the Ordinance void and enjoining Defendants from enforcing it, and (2) directing the Planning Board to resume consideration of the Application for use of the Property without consideration of the invalid Ordinance.

Dated: May 18, 2011

Respectfully submitted,

ARCHER & GREINER, P.C.

By: _*/s/Christopher R. Gibson*_
Christopher R. Gibson

One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ 08033
(856) 354 3077

ARNOLD & PORTER LLP
Peter L. Zimroth
Bruce R. Kelly
Kerry A. Dziubek
(admitted *pro hac vice*)
399 Park Avenue
New York, NY 10022
(212) 715 1000
Fax No.: (212) 715-1399

*Attorneys for Plaintiffs*

*Of Counsel:*

THE BRENNAN CENTER
Faiza Patel
Emily Berman
Elizabeth Goitein

(applications *pro hac vice* to be submitted)
161 6th Avenue
New York, NY 10013
(646) 292-8310

ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
Aparna Garg
Bethany Li
Kenneth Kimerling
Sameer Ahmed
(applications *pro hac vice* to be submitted)
99 Hudson St., 12th Fl.
New York, NY 10013
(212) 966-5932